IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| MARK L. MARTINEZ,<br><br>    Plaintiff,<br><br>vs.<br><br>U.S. BANK,<br><br>    Defendant. | No. C12-0077<br><br>RULING ON MOTION FOR<br>SUMMARY JUDGMENT |

This matter comes before the Court on the Motion for Summary Judgment (docket number 29) filed by Defendant U.S. Bank on October 8, 2013, the Brief in Support of His Resistance (docket number 34) filed by Plaintiff Mark L. Martinez on November 9, and the Reply Brief (docket number 41) filed by U.S. Bank on November 20. The parties' requests for oral argument are denied. This matter will be decided without oral argument, pursuant to Local Rule 7.c.

## I. PROCEDURAL HISTORY

On April 30, 2012, Plaintiff Mark L. Martinez filed a petition in the Iowa District Court for Linn County, seeking damages from Defendant U.S. Bank for discrimination based on national origin, in violation of the Iowa Civil Rights Act. On August 10, 2012, U.S. Bank removed the action to this Court and filed its answer, denying the material allegations and asserting affirmative defenses.

On October 26, 2012, the Court adopted a proposed Scheduling Order and Discovery Plan submitted by the parties. The case was referred to the undersigned magistrate judge for the conduct of all further proceedings in accordance with 28 U.S.C. § 636(c) and the consent of the parties. After consulting with counsel, it was agreed that the matter would come on for trial on March 3, 2014.

On October 8, 2013, U.S. Bank timely filed the instant motion for summary judgment.

## II. RELEVANT FACTS

On March 29, 2011, Martinez was terminated from his employment as a branch manager for U.S. Bank. Martinez claims he was fired because he is Hispanic. U.S. Bank claims Martinez was terminated because it was believed he violated a federal regulation in facilitating a bonus paid to a customer, lied during an investigation into the matter, and disregarded instructions not to discuss the case before talking with certain bank officials.

Martinez was hired in February 2008 to fill the position of branch manager at the U.S. Bank branch located on the AEGON/Transamerica campus in Cedar Rapids. Joe Childers was district manager and served as Martinez's direct supervisor for about three years. He was succeeded by Chuck Frederick in June 2010. Frederick's job title was vice-president and district manager. His district included 14 retail branches. Frederick reported to Nancy Kasparek, regional president in Community Banking.

At his deposition, Martinez described his working relationship with Frederick as "hard." According to Martinez, Frederick was "harsh, demanding." Martinez testified that some of the emails sent by Frederick to staff were "kind of my way or the highway type of e-mails. If you don't do what I say, I'll fire you. If you don't do what I say, I'll write you up type of mentality."[1] It was Martinez's impression that Frederick was "generally more harsh and demanding" than Childers had been. While Martinez acknowledged that Frederick interacted with other U.S. Bank employees in that manner, Martinez felt like he was being "singled out" for unfair treatment.

In late 2010, U.S. Bank mailed a promotional coupon advising recipients that "[f]or a limited time, you will get $150 just for switching your checking account with direct

---

[1] U.S. Bank's Appendix at 28.

deposit to U.S. Bank."[2] The "fine print" on the offer stated: "Get your Cash Bonus when you open a new consumer checking account by December 18, 2010 and set up a recurring direct deposit of at least $100 within 60 days of account opening." The fine print also stated that the bonus would be reported as interest earned.

A customer called U.S. Bank and asked if it would "honor the mailer."[3] The customer already had a personal checking account with the bank, but wanted to start a business checking account for his janitorial business. After meeting the customer at the bank, Martinez told the customer the bank would "honor the offer." It was unusual for Martinez to deal with business accounts, because the branch at AEGON was an "onsite branch," which was generally accessible only by employees of AEGON/Transamerica.[4] The transaction was handled by Lynn Southgate, another banker at that location.

A "couple of months" later, it was determined that the customer had met the requirement of having direct deposits placed into the new account. After Southgate informed Martinez that the requirements had been met, Martinez then attempted to deposit $150 in the customer's business account. At his deposition, Martinez described the transaction as follows:

> I went to the system. I pulled up his account. I pulled the business account. I made the initial deposit into that account, and the system didn't let it go through. So at that point I'm thinking, okay, maybe I put it in the wrong account, it was supposed to go into his personal account. So I redid that again, and I put it in his personal account. The system took it. I printed a copy of the deposit.

---

[2] *Id.* at 8.

[3] There is some dispute whether the call was made before or after the offer expired on December 18, 2010. When asked at his deposition if the call was made in March 2011, Martinez responded "could be." He acknowledged that "all of this happened very close in time to the termination of your employment." U.S. Bank's Appendix at 33.

[4] The customer's wife was an employee at AEGON/Transamerica.

> Then I notified Everett and said, on this date you will see the 150 into your checking account. At the end of the year, you're going to get a 1099 on that 150, and you're going to have to claim that as income earned. He said, I understand that. Thank you very much.
>
> In passing between Lynn and I, she goes, did we get Everett taken care of? I said, yes, I made the deposit, and everything is fine. That was the end of that.

Deposition of Mark L. Martinez, 132:6-22 (U.S. Bank's Appendix at 36).

On March 25, 2011, Linda Tutt, an operations specialist with U.S. Bank, informed Frederick that Martinez had paid a bonus into a consumer checking account despite the fact that the consumer checking account was not new. Frederick reviewed the account and sent an email to Martinez the same day. Frederick advised Martinez that the payment of cash bonuses, rewards, and fee waivers "are being scrutinized from a high level."[5] The email stated, in part:

> A $150 cash bonus came up on a report from OPS which I had Kelly research; the bonus was handled incorrectly and puts the bank in violation of Reg Q. The $150 offer specifically states the bonus is for consumer accounts only and will be reported to the IRS by Form 1099-INT as interest earned. Reg Q prohibits banks from paying interest on business checking accounts — that's the reason you could not get it to take in the first place. By putting the cash bonus in the consumer account you circumvented the law which is a violation of Reg Q.

Email from Charles D. Frederick to Mark L. Martinez, dated 03/25/2011 (U.S. Bank's Appendix at 10).

---

[5] At branch manager meetings on October 7, 2010, December 3, 2010, and January 7, 2011, Frederick had previously advised branch managers that "increased scrutiny would be given to unwarranted refunds and cash rewards, because bank profitability had decreased."

During Martinez's employment by U.S. Bank, a federal regulation promulgated under section 19 of the Federal Reserve Act, known as "Regulation Q," prohibited the payment of interest on demand deposit accounts. A "demand deposit" is an account that is payable on demand and for which the financial institution has not reserved the right to require at least seven days' notice prior to withdrawal or a transfer of account funds. Business accounts are considered demand deposit accounts. Therefore, Regulation Q prohibited the payment of interest on business accounts.[6]

Martinez testified at his deposition that he was not aware of Regulation Q and did not understand that it was illegal to pay interest on a business account. Martinez could not recall having received any training regarding Regulation Q. Martinez's training transcript shows that he completed training on February 21, 2008, entitled In-office Banker Level 3.2. The workbook for that training states: "Federal *Regulation Q* prohibits some types of business customers from earning interest on deposit accounts."[7]

Frederick testified that he told Martinez "not to talk to anyone else about this, that I would get with HR, him and I would have a conversation, and we would talk it over at that point." Nonetheless, Martinez contacted Rita Stanley, division operations manager at U.S. Bank, and asked about his conduct and Regulation Q. Martinez believed it was okay to call Stanley because she was copied in on the email from Frederick to Martinez, and he wanted to know "how to correct the error."

On March 28, 2010, Martinez, Frederick, and Rachel Hauger, a human resource generalist with U.S. Bank, discussed the matter in a telephone conference. Martinez explained that he had tried to deposit the cash bonus into the customer's business checking account, but U.S. Bank's system would not allow the transaction to process. Martinez also

---

[6] Regulation Q was subsequently repealed.

[7] U.S. Bank's Appendix at 6 (Italics in original).

asked whether everyone who had "made an error in refunding a customer's account" was interviewed by HR.

According to Frederick, Martinez said he had not called "retail support" for direction regarding the cash bonus transaction, but later admitted he had called, and acknowledged that retail support had instructed him not to deposit the cash bonus into the business checking account.[8] On March 23, 2011, Lynn Southgate, another banker at Martinez's branch, contacted retail support regarding a "manual interest adjustment." Southgate was told that "they can only process into an interest bearing acct cust received offer on personal acct to be opened, not business."[9] Martinez denies that he contacted retail support for information about refunding the bonus into the customer's checking account, but instead made his own decision to refund the bonus because he understood that he had the authority to do so.

Frederick testified that Linda Tutt, an operations specialist with U.S. Bank, told him that Martinez had changed his story about whether he had contacted retail support. According to Frederick, Tutt told him that Martinez initially told her he had not contacted retail support for assistance, but later admitted that he had contacted retail support. Frederick also claims that his administrative assistant, Kelly Anderson, told him that Martinez changed his story regarding contacting retail support for assistance. Martinez denies that he changed his story, however, and asserts it was Southgate who contacted retail support regarding the cash bonus transaction.

Frederick testified he believed Martinez had violated Regulation Q in his handling of the cash bonus, had been dishonest about attempting to contact retail support regarding the transaction, and, by contacting Stanley, had disobeyed Frederick's instruction not to

---

[8] Retail support is an internal call center that is designed to allow bankers to call in and ask questions regarding procedural items about which they may need clarification.

[9] U.S. Bank's Appendix at 11.

discuss the case with anyone prior to a telephone conference with human resources. Frederick consulted with Rachel Hauger, the human resources generalist, about terminating Martinez's employment. At that time, Frederick consulted with human resources regarding all employee terminations. Frederick also consulted with Nancy Kasparek, regional president in community banking and Frederick's immediate supervisor, regarding his decision to terminate Martinez's employment. While Frederick was not required to consult with Kasparek, he did so because he had only been in the position of district manager for nine months.

On March 29, 2011, Frederick went to the AEGON branch and terminated Martinez's employment. According to Martinez, he was told that his employment was being terminated because he violated Regulation Q and the bank would be paying a fine of $10,000.[10] Martinez admits that he does not know whether Frederick knew he was Hispanic at the time he was terminated, and Frederick never made any reference to Martinez's national origin. Martinez was born in the United States, but his family is from Mexico. According to an affidavit of Mary E. Loesch, filed in resistance to the motion for summary judgment, Martinez is "dark skinned."[11] Additional facts as they pertain to the conclusions of law will be set forth below.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute as to a material fact "'exists if a reasonable jury could return a verdict for the party opposing the motion.'" *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Humphries v.*

---

[10] In fact, the potential violation was never reported to regulatory authorities and no fine was ever paid.

[11] Affidavit of Mary E. Loesch at 1, ¶ 3 (Martinez's Appendix at 69).

7

*Pulaski County Special School District*, 580 F.3d 688, 692 (8th Cir. 2009)). A fact is a "material fact" when it "might affect the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to establish the existence of a genuine dispute as to a material fact, the non-moving party "'may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Communications, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)). Instead, the non-moving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'" *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873); *see also Anderson*, 477 U.S. at 248 (A nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party."). "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

The Eighth Circuit has previously noted that "summary judgment should be used sparingly in the context of employment discrimination and/or retaliation where direct evidence of intent is often difficult or impossible to obtain." *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1082 (8th Cir. 2010) (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1117 (8th Cir. 2006)). Notwithstanding this point, however, "no separate summary judgment standard exists for discrimination or retaliation cases and such cases are not immune from summary judgment." *Id.* at 1082-83. Stated otherwise, there is no "discrimination case exception" to the application of summary judgment. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011).

## IV. DISCUSSION

In his petition at law, Martinez claims that U.S. Bank discriminated against him on the basis of his national origin, in violation of the Iowa Civil Rights Act of 1965 (Iowa Code ch. 216). The Iowa Civil Rights Act, which is modeled after Title VII of the Civil Rights Act of 1964, makes it unlawful to discharge any employee because of the employee's age, race, creed, color, sex, sexual orientation, gender identity, national origin, religion, or disability. Iowa Code § 216.6(1)(a). In its motion for summary judgment, U.S. Bank argues that the "dismiss at pleasure" provision of the National Bank Act preempts all state law employment causes of action brought by officers of a bank. Alternatively, U.S. Bank argues that Martinez's claim cannot survive summary judgment under a *McDonnell Douglas* analysis. The Court will address the latter argument first.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), the Court held that a complainant in a Title VII case must carry the initial burden of establishing a *prima facie* case of discrimination.[12] If the complainant establishes a *prima facie* case of discrimination, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's termination. *Id.* If the employer is able to state some legitimate reason for the adverse employment action, then the employee must be afforded a fair opportunity to show that the employer's stated reason for his termination was in fact pretext. *Id.* at 804. *See also Guimaraes v. SuperValu, Inc.*, 674 F.3d 962 (8th Cir. 2012) (applying the *McDonnell Douglas* analysis to the plaintiff's claim that she was discriminated against based on her national origin).

To establish a *prima facie* case of discrimination, Martinez must show: (1) he is a member of a protected class, (2) he met U.S. Bank's legitimate expectations, (3) he

---

[12] *McDonnell Douglas* involved a claim of racial discrimination under Title VII of the Civil Rights Act of 1964. The burden-shifting analysis established in *McDonnell Douglas* has since been broadly applied to all types of employment discrimination, under both state and federal statutes.

suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination. *Id.* at 973-74. *See also Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011). In its brief, U.S. Bank concedes that Martinez can satisfy the first three elements required for a *prima facie* case. While "national origin" is not defined in either Chapter 216 of the Iowa Code or Title VII, it generally refers "to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 88 (1973). Here, Martinez was born in the United States, but his "national origin" is Mexico. In addition, U.S. Bank acknowledges that until the episode leading to his termination, Martinez was meeting its legitimate expectations. Finally, it is undisputed that Martinez suffered an "adverse employment action."

U.S. Bank argues, however, that because the circumstances surrounding Martinez's firing do not "give rise to an inference of discrimination," Martinez has not established a *prima facie* case.[13] Martinez concedes that neither Frederick nor anyone else at U.S. Bank made any reference to his national origin prior to his termination. Based on his surname and darker skin, however, Martinez asserts that Frederick must have known that he is Hispanic. Martinez argues that Frederick's discrimination based on national origin may be inferred for three reasons: First, Martinez was instructed to engage in "job shadowing"; second, Frederick inquired about Martinez's whereabouts at a "team-building" event; and third, Martinez was disciplined differently from another employee similarly situated.

---

[13] Citing *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008), Martinez asserts that because U.S. Bank has articulated non-discriminatory reasons for his termination, the Court should skip directly to Step Three — whether Martinez has shown the articulated reasons are mere pretext. While much of the evidence applies to both the first and third steps, Martinez has not cited any Eighth Circuit decision which adopted this condensed approach, and the Court declines to do so.

Martinez first asserts that Frederick's discrimination based on national origin may be inferred because Martinez was required to undergo job shadowing. In his brief, Martinez concedes that others were also selected to undergo job shadowing, but argues that he "was forced to shadow a branch manager who had fewer skills than he for a longer period of time."[14] In March 2011, Martinez was directed to job shadow Mark Troyer, another branch manager in Frederick's district. Frederick believed that Martinez was having difficulty providing performance coaching to a teller who worked in his branch, and asked Martinez to shadow Troyer because "Mark Troyer is one of the best coaching managers we have." According to Martinez, Troyer questioned why he was training Martinez, and told Martinez that Martinez should be training him. Between January 2011 and June 2013, at least nine other "manager shadowees" were required to job shadow with seven "coaching managers."[15] Mary Loesch, a former branch manager who signed an affidavit in support of Martinez's resistance to the motion for summary judgment, states that she job shadowed under Mark Troyer, describing him as "a very talented coach."[16] None of the other managers required to job shadow were Hispanic, and there is no evidence to suggest that Martinez being required to job shadow was related to his national origin.

Martinez also claims that national origin discrimination may be inferred because Frederick inquired about his absence at a team-building gathering that followed a branch managers' meeting. Martinez attended the gathering — which was held at a bar — for about 45 minutes, but left before Frederick arrived. When Frederick arrived, he asked "where's Mark?", and was told that he had left. Martinez testified that other managers

---

[14] Martinez's Brief (docket number 34) at 21.

[15] U.S. Bank's Appendix at 16.

[16] Affidavit of Mark E. Loesch at 2, ¶ 9 (Martinez's Appendix at 70).

11

had also left by the time Frederick arrived, but Frederick did not inquire about their whereabouts.

Finally, Martinez asserts that he was treated differently than another non-Hispanic branch manager. Specifically, on December 18, 2008, Jackie Hager "processed a transaction on [her] own account when $130 was placed in [her] account versus the fees being refunded into a customer's account." Hager merely received a written warning from Joe Childers (Frederick's predecessor).[17] Martinez argues that when similarly situated employees are treated in a disparate manner, the circumstances give rise to an inference of discrimination.

There are two lines of cases on the standard to determine whether employees are "similarly situated" at the *prima facie* stage of the *McDonnell Douglas* test. *Pye*, 641 F.3d at 1019 (citing *Wimbley v. Cashion*, 588 F.3d 959, 962 (8th Cir. 2009)). "One line sets a 'low threshold,' requiring only that the employees are 'involved in or accused of the same or similar conduct and are disciplined in different ways.' The other line more rigorously requires that the employees be 'similarly situated in all respects.'" *Id.* In *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 857 (8th Cir. 2004), the Court suggested that "[t]he test to determine if one is 'similarly situated' varies at each stage of a *McDonnell Douglas* analysis. At the *prima facie* stage it is 'not onerous,' however, at the third stage (proving pretext) it is 'rigorous.'" Here, the Court concludes that Hager was not "similarly situated" under either test. Clearly, she and Martinez were not "similarly situated in all respects," and they did not engage in the same or similar conduct.

While Hager was not terminated as a result of her mistake, the circumstances were different and, importantly, it was a different decision-maker. *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000) ("[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same

---

[17] U.S. Bank's Appendix at 15.

conduct without any mitigating or distinguishing circumstances."). While Childers apparently believed that Hager's actions were inadvertent and warranted only a warning, Frederick believed that Martinez had violated a federal regulation, had lied regarding whether he had called the help line and been instructed not to process the transaction, and had failed to follow instructions not to discuss the matter.

The Court does not believe that these circumstances, individually or collectively, "give rise to an inference of discrimination." *Guimaraes*, 674 F.3d at 973-74; *Pye*, 641 F.3d at 1019. It was not unusual for branch managers to shadow other managers for short periods of time, and there is no evidence that Martinez was singled out in this regard. Similarly, it is not surprising, or evidence of discrimination, that Frederick would inquire regarding Martinez's whereabouts at a team-building gathering. Furthermore, the fact that Childers only warned Hager regarding her actions and Frederick decided to fire Martinez for his actions, does not give rise to an inference of discrimination. Different supervisors simply reached different decisions under different circumstances.

The question before the Court is not whether Frederick's decision to fire Martinez under these circumstances was wise, or even just. *Guimaraes*, 674 F.3d at 977 ("The employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgment made by employers, except to the extent that those judgments involve intentional discrimination.") (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999)). Rather, the Court must determine whether the facts, when viewed in the light most favorable to Martinez, give rise to an inference that he was fired because he is Hispanic. Because I am unable to make that finding, Martinez has failed to establish a *prima facie* case of discrimination.

Because Martinez has failed to establish a *prima facie* case of discrimination, his claim must fail. Even if the Court found that a *prima facie* case had been established, however, the claim fails nonetheless because Martinez is unable to show that the

nondiscriminatory reasons cited by U.S. Bank were mere pretext. To avoid summary judgment, the ultimate burden falls on Martinez "to produce evidence sufficient to create a genuine issue of material fact regarding whether [the employer's] proffered nondiscriminatory justifications are mere pretext for intentional discrimination." *Guimaraes*, 674 F.3d at 973 (quoting *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1007 (8th Cir. 2005)).

U.S. Bank claims that Martinez was fired because Frederick believed Martinez violated Regulation Q, lied about calling the help line, and failed to follow instructions not to discuss the matter. According to Frederick, he no longer "trusted" Martinez and could not have him continue as a branch manager. Frederick told Martinez that the bank intended to report the violation and would be required to pay a $10,000 fine. Ultimately, U.S. Bank apparently determined that no violation had occurred, because it was not reported to any regulatory authority. However, the question before the Court is not whether Martinez's actions violated Regulation Q. The issue is whether Frederick honestly *believed* Martinez's action violated Regulation Q or if it was simply a pretext for his discriminatory intent. *Scroggins v. University of Minnesota*, 221 F.3d 1042, 1045 (8th Cir. 2000) (the relevant inquiry is whether the employer *believed* the employee was guilty of misconduct justifying discharge); *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 811 (8th Cir. 2005) (finding that if the employer was motivated by a good faith belief the employee was dishonest, then it was not motivated by race).

The focus of inquiry at the summary judgment stage always remains on the ultimate question of law: "whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the plaintiff because of the protected characteristic." *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1018 (8th Cir. 2005). It may be that Frederick was mistaken in his belief that Regulation Q was violated, or that he overreacted in terminating Martinez for his handling of the bonus here. The training Martinez received on Regulation Q was minimal, at best. Martinez was an

at-will employee, however, and could be terminated for any reason, or no reason at all, provided that it was not a discriminatory reason. It is not for the Court to decide whether Martinez's conduct was egregious enough to warrant termination. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) ("In the absence of any evidence of discriminatory intent, however, it is not the prerogative of the courts or a jury to sit in judgment of employers' management decisions.").

There is some evidence to suggest that Frederick may have been displeased with Martinez for reasons other than those given for his termination. Mary Loesch, who was employed as a branch manager by U.S. Bank from August 2009 through January 31, 2012, stated in her affidavit that shortly after Martinez was terminated, Frederick said Martinez "should not have gone behind his back to Nancy Kasparek," Frederick's boss.[18] Apparently, Martinez and Frederick disagreed regarding the profitability of Martinez's branch office, and Martinez called Kasparek. Even *if* that is the true reason why Frederick fired Martinez, however, it is not an *unlawful* reason. In the context of the *McDonnell Douglas* analysis, the use of the word "pretext" means that "a defendant's proffered discriminatory explanation for adverse employment action is a pretext *for unlawful discrimination*, not that it is merely false in some way." *Strate*, 398 F.3d at 1017 (emphasis in original). *See also Guimaraes*, 674 F.3d at 976-77.

In summary, the Court concludes that even when viewing the evidence in the light most favorable to Martinez, Plaintiff's claim for discrimination based on national origin must fail. The Court finds, as a matter of law, that no reasonable jury could find that Martinez was fired because he is Hispanic. Accordingly, the Court finds that U.S. Bank is entitled to summary judgment.[19]

---

[18] Affidavit of Mary E. Loesch at 4, ¶ 11 (Martinez's Appendix at 72).

[19] Because the Court finds that Martinez's claim fails on the merits, it is not
(continued...)

## V. ORDER

IT IS THEREFORE ORDERED as follows:

1. The Motion for Summary Judgment (docket number 29) filed by U.S. Bank is **GRANTED**.

2. The Petition at Law (docket number 5) filed by the Plaintiff is **DISMISSED**.

3. This case is **CLOSED**.

DATED this 10th day of December, 2013.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA

---

[19] (...continued)
necessary to address U.S. Bank's alternative argument that it is preempted by the National Bank Act.